UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET # 05-11738-EFH

Brendan M. McGUINNESS, pro se
   Plaintiff,

vs.

James R. BENDER, et al.
   Defendants;

vs.

David RILEY, Deputy Superintendent;
Superintendent MATESANZ; and
Director of Security CASTILLE, all
of the Norfolk County Correctional
Facility,
   Defendants.

---

### VERIFIED AMENDED COMPLAINT.

#### Parties.

42.) This amended complaint's number sequence shall pick up where the original complaint left off. All of same, and what appears above, is hereby incorporated by reference.

43.) David Riley, Superintendent Matesanz and Director of Security Castille are all employed by the sheriff of Norfolk County, who is not a party to this action. They all work in various capacities at the Norfolk County Correctional Facility (hereafter "NCCF" and these particular defendants as "NCCF defendants" collectively). They are all residents of the Commonwealth of Massachusetts and citizens of the United States. Being sued in both their individual capacity and as employees of the state, they can all be served at: NCCF, 200 West Street, Dedham, MA 02027.

#### Facts.

44.) In March of 2004, the plaintiff was arrested in the County of Norfolk and remanded to the NCCF defendants' custody to await trial on robbery charges.

45.) a couple weeks later, accused of wrongdoing, plaintiff was escorted to isolation.

46.) NCCF has two types of unit for housing inmates who have misbehaved. One is the isolation unit referred to above; the other is called segregation.

47.) Segregation is a unit where inmates who require protective custody live. Also, inmates who have been accused of wrong-doing and pending a formal adjudication of the allegations are also housed in segregation.

48.) In segregation, inmates are allowed to have their regular property from general population, including but not limited to canteen items (food and coffee and cosmetics and stationary and magazines/books).

49.) In March of 2004, NCCF's isolation unit was a lot different than segregation, insofar as inmates were afforded a bed-roll, toilet paper and a set of clothes---but nothing to read, write with, no incoming mail, no food of one's own, coffee.

50.) Isolation is a form of punishment which is used at NCCF upon a finding of guilt for certain violations of the rules (i.e. a sanction).

51.) In March of 2004, when plaintiff was placed in the isolation unit, he had not yet been found guilty of the violation he is alleged to have committed.

52.) When plaintiff was placed into isolation as described above, there were open cells in segregation. In fact, NCCF houses two inmates to a cell in segregation. Isolation entails single occupancy cells.

53.) An hour after being placed into isolation as described above, plaintiff suffered an apparent nervous breakdown during which he attempted to kill himself.

54.) As a result of said suicide attempt, plaintiff was sent to the State Hospital in Bridgewater for a 30 day evaluation.

55.) Upon completion of said evaluation, in April of 2004, plaintiff was returned to the custody of Norfolk County, at which time the defendants Riley, Matesanz and Castille (hereafter "NCCF defendants") refused to allow him to live at NCCF.

56.) Said decision was reached by the NCCF defendants alone, without any sort of court order, or even consultation with the DA's office.

57.) Plaintiff was shipped off to the jail in Dartmouth (i.e. Bristol County) on said occasion. He remained there for about two months and returned to

Dedham at the start of the Summer.

58.) During the summertime, plaintiff was once again accused of violating the rules of NCCF. As a result, he was escorted to segregation to await the disciplinary process.

59.) The NCCF defendants, rather than afford plaintiff a hearing and a chance to clear himself, once again shipped him off to another county, this time Plymouth.

60.) The decision to ship plaintiff to Plymouth County custody was reached by the NCCF defendants without any consultation with the DA's office or an order of the court.

61.) In September of 2004, Plymouth County officials returned plaintiff to the custody of the NCCF defendants. Plaintiff was allowed to remain at NCCF. Despite the fact that plaintiff was not misbehaving at NCCF, the NCCF defendants sought and obtained permission from the DA's office pursuant to M.G.L. c. 276, sec. 52A to transfer plaintiff to the custody of the DOC.

62.) On 9/29/04, defendant Riley told plaintiff that he would be transferred to the DOC. On that day, when plaintiff arrived in booking to depart for points unknown, Riley told plaintiff he was going to Walpole.

63.) Plaintiff objected, pointing out that this was simply illegal. Riley, whom plaintiff knew as a family acquaintence and therefore trusted, told plaintiff that this decision was reached by "Central Classification" at the DOC and was out of his hands. He added, however, that should plaintiff become embroiled in the system based upon his past at Walpole, plaintiff should write to Riley for help.

64.) In all the events which follow, plaintiff sent numerous letters to Riley. Riley never made any effort to regain custody of plaintiff or have him moved closer to home and court.

65.) On 9/29/04, the NCCF defendants shipped plaintiff to MCI-Cedar Junction in Walpole. "Massachusetts State Prison" is the slogan at the front gate of Walpole.

66.) On 10/18/04, plaintiff was transferred by the DOC defendants to Souza-Baranowski Correctional Center ("SBCC") as a result of a brawl which

occurred the day before. Plaintiff was housed with general population inmates at Walpole in the Orientation Unit.

67.) From 10/18/04 until 3/7/05, plaintiff was held in solitary confinement at SBCC's Special Management Unit ("SMU"). During all this time, the DOC defendants never afforded him a hearing on the incident for which he was being confined---i.e. the 10/17/04 incident at Walpole.

68.) On 1/30/05, plaintiff had a fight with two officers in SMU. The next day, plaintiff again attempted suicide. This resulted in the events described in the original complaint (i.e. the incident during which plaintiff was the subject of the use of force, resulting in serious injuries).

69.) On 3/7/05, plaintiff was taken to Concord District Court in regards to an old fine. The judge there ordered plaintiff to serve 24 days (at $30 per dium) to pay off the bill. So plaintiff was sent to Billerica House of Correction.

70.) Prior to leaving DOC custody, plaintiff wrote many letters to defendant Bender and defendant Russo outlining the illegality of housing a pre-trial detainee at a State Prison. They disagreed and ignored him.

71.) Children are not allowed to visit inmates in SBCC's SMU. Plaintiff has a daughter who was an infant at the time and completely inconsolable as a result of not seeing her father.

72.) Plaintiff was serving no sanction in the SMU, but merely awaiting some form of process from the defendants. Plaintiff was not afforded a hearing. Furthermore, citing a restitution sanction which plaintiff had incurred over a decade previously on a separate sentence, the DOC defendants would not allow plaintiff to purchase canteen items such as cosmetics and/or a radio---the only item allowed to alleviate the tedium.

73.) On 3/26/05, plaintiff was again remanded to the custody of the NCCF defendants. They would not allow him at NCCF, so they sent him to Plymouth County yet again. The DOC did not make any effort to regain custody of the plaintiff in order to adjudicate the disciplinary reports incurred by the plaintiff on 10/17/04 at Walpole or on 1/30/05 at SBCC.

74.) While at Plymouth in June of 2005, officials there allege that plaintiff

was involved in a donneybrook and suffered stab wounds to the head.

75.) When they shipped plaintiff to Plymouth on 3/26/05, the NCCF defendants did so of their own volition without asking anyone else's opinion or permission.

76.) On 7/8/05, plaintiff was returned to NCCF. Defendant Castille spoke to the plaintiff in booking and conveyed to him that defendants Riley and Matesanz were pow-wowing on what to do with me.

77.) Shortly thereafter, plaintiff was placed in restraints and then told that he had to go to SBCC again. Plaintiff refused; the defendants approved the use of force to drag plaintiff bodily to the van. Plaintiff did not resist, he merely stated that the actions and decisions of the defendants were ilegal and, therefore, plaintiff felt obligated to have no part in his own rights being violated.

78.) When plaintiff returned to SBCC on 7/8/05, he had been out of custody for over four (4) months. Nevertheless, defendants Russo and Bender decided rehash the disciplinary reports incurred by plaintiff on 10/17/04 at Walpole and on 1/30/05 at SBCC. Both tickets were referred to the Special Hearing Officer ("SHO") for the Departmental Disciplinary Unit ("DDU"). One of the incidents was also referred to the DA's office and a complaint is pending in Clinton District Court (for the 1/30/05 incident).

79.) Plaintiff was sentenced to the DDU for a term of five (5) years. He was not even serving a prison sentence yet. The DDU is located at the State Prison in Walpole.

80.) Plaintiff pled guilty to the charges made against him in the disciplinary reports. However, he made the single issue on appeal the propriety of sentencing a pre-trial detainee to DDU and, moreover, the propriety of dredging up disciplinary offenses from a previous period of time spent in DOC custody. Bender denied the appeal.

81.) In the Fall of 2005, plaintiff pled guilty to reduced charges in his case out of Norfolk County and was sentenced to a term not less than 3½ years, nor more than 3½ years and a day. With credit for time served, plaintiff's release date has been set at 8/9/07.

82.) Upon sentencing, plaintiff was not sent to Concord for an initial class-

ification, as would usually obtain with a new commitment.

83.) Plaintiff will be confined to DDU for his entire incarceration on the sentence described in par. 81, supra, as a result of something that occurred before he was even sentenced and properly turned over to DOC custody.

84.) Sending sec. 52A pre-trial detainees to the DDU is a very new policy in the DOC.

85.) When plaintiff was forced to go to SBCC on 7/8/05, neither the DA for Norfolk County nor a superior court justice gave the go-ahead.

86.) The transfer described in par. 85 was carried out relying on the fact that the DA's office had approved a transfer in September of 2004. No new permission was sought.

### CLAIMS FOR RELIEF.

87.) The foregoing is hereby incorporated by reference.

### Count Three:

88.) The NCCF defendants have violated plaintiff's fundamental rights as a pre-trial detainee to due process of law under the state and federal constitutions in the following ways:

　a.) in March of 2004, by taking plaintiff directly to isolation upon a bare allegation of misconduct constituted punishment prior to any process to determine the merits, vel non, of the accusation. When the NCCF defendants choose to isolate an inmate accused of breaking a rule, rather than placing him in the less onerous segregation to await adjudication, they commit a text-book due process violation;

　b.) the NCCF defendants have adopted an informal cooperative agreement with their neighboring counties to "trade" inmates when need be. It is the defendants who decide when the "need be". Plaintiff was sent to Plymouth County twice and Bristol County once; these transfers were carried out without any consultation with or permission from the DA's office or a superior court justice. This is illegal. See M.G.L. c. 52A. This statute is the only law in Massachusetts which contains a provision for sending a pre-trial detainee to a different county than the one in which he was arrested. Sec. 52A provides a clear liberty interest to plaintiff in not being summarily shipped to all corners of the globe in the middle of the night. That liberty interest is protected by the 14th Amendment to the United States Constitution;

c.) furthermore, sec. 52A allows for the transfer to "a correctional institution of the commonwealth" any pre-trial detainee who has previously served time in one of same. The statute, of course, sets out a **process** by which such transfers have to be accomplished. The DOC defendants are clearly violating the letter and spirit of sec. 52A. Walpole and SBCC are maximum security prisons! Article 12 of the Massachusetts Declaration of Rights forbids, inter alia, the legislature from enacting any law that subjects anybody to an "infamous punishment" without trial by jury. (Or, of course, the intelligent and knowing waiver thereof.) The SJC stated in Brown v. Comm'r of Correction, 394 Mass, 89 (1985), that confinement at the State Prison in Walpole is an infamous punishment. The policy reasons discussed in support of that conclusion include the fact that Walpole is the maximum security prison in the state where the worst of the worst are housed. Today, in 2005, Massachusetts has a second maximum security prison. It is located in Shirley and it is called SBCC. This represents a clear violation of state law and, in proper context with the wider claims involved here, plaintiff asks the Court to exercise pending state law jurisdiction in the interest of justice. The NCCF defendants dropped plaintiff off at Walpole on 9/29/04 in violation of clearly established law;

d.) each time plaintiff was accused of violating the rules and regulations of NCCF, the defendants jumped the gun and sent him elsewhere. In so doing, they deprived plaintiff of the opportunity to defend against the charges! This, too, represents punishment absent due process;

e.) when plaintiff refused to go peacefully strolling to the van which would relocate him to SBCC, the NCCF defendants ordered an/or granted permission that force be used on plaintiff. The manner in which this force was used violated the defendants' own state law regulations governing the use of force at the jail. Moreover, the force was used in order to effectuate an illegal transfer;

f.) as a result of the transfer to SBCC, plaintiff (still a pre-trial detainee serving no sentence) was kept locked up in SMU, and the DOC defendants denied him visits with his infant daughter as a "rule of the unit"; they did not allow him to go to the store; and the sum total effect of this confinement was that plaintiff was effectively being punished in every sense of the word---this violates due process insofar as plaintiff was serving no sanction. He was merely awaiting action.

**Count Four:**

89.) The DOC defendants violated plaintiff's due process rights in myriad ways when they lost custody of him for a period of 4 months and, at the time when he was returned to their custody for a new and separate reason, dredged up old disciplinary reports which were not properly

resolved during his previous period of (illegal) confinement. It was, in one case, pertaining to an incident which happened almost one year before and, in the other case, a matter properly before a state court judge on a complaint against plaintiff.

### Count Five:

90.) the DOC defendants were responsible for sanctioning plaintiff with DDU time and a court case. Plaintiff argues that because he was in fact a pre-trial detainee, these actions amount to double jeopardy in violation of the state and federal constitutions'/common law's proscriptions of same.

### Count Six:

91.) the DOC defendants deprived plaintiff of an initial classification upon sentencing as is mandated by their own state law regulations. Due to the fact that the lack thereof deprives plaintiff of getting any sort of placement at a place other than DDU, this too constitutes the deprivation of a protected liberty interest without due process of law ( opportunity to earn good-time credits).

### Count Seven:

92.) Finally, this new policy of "carrying over" sanctions from a pre-trial detainee when he is finally and formally sentenced to time in prison violates due process considerations. When an inmate starts a new term of commitment, he must be classified as a new commitment and given an opportunity to demonstrate that he'll behave. Next thing that'll happen if this is allowed to stand is prisoners who are released from custody while in DDU and come back months or years later will be forced to finish the sanction! Plaintiff's release from DOC custody on 3/7/05 ended the DOC's legal propriety in holding the old disciplinary reports against him.

### PRAYERS FOR RELIEF.

i.) from the NCCF defendants, plaintiff seeks $50,000 in the aggregate, however arrived at, as compensation for all of the things which will

come to light at trial/judgment; also, $25,000 total against the three men as punishment for ignoring plaintiff's constant stream of correspondence and failing to act in the face of clear law which prohibited the very course of action they had chosen

ii.) from DOC defendants Bender and Russo, for their parts in either taking part in or refusing to redress the placement of plaintiff in a State Prison without trial by jury (in violation of Article 12 to the Mass. Declaration of Rights), and for all the time plaintiff was subjected to same (i.e. false imprisonment), plaintiff asks for compensatory damages in the amount of $12,500 and punitive damages in the amount of $7,500.

iii.) Plaintiff seeks an expedited decision on the issue of whether his DDU confinement is in any way improper and, if so, he seeks an order releasing him to general population and an initial classification to determine where he should serve the remainder of his sentence. Also, good-time credits in an amount to be determined.

iv.) Plaintiff seeks trial by jury on all counts so triable.

RESPECTFULLY SUBMITTED,

/Brendan McG/
BRENDAN M. McGUINNESS
S.B.C.C./PRO-SE
P.O. BOX 8000
SHIRLEY, MA  01464-08000

### VERIFICATION

I, Brendan M. McGuinness, the plaintiff in this case, hereby verify and affirm that the facts stated in this document are true and correct to the best of my knowledge, recollection and belief.

/Brendan McG/
Brendan M. McGuinness

DATE: 12/15/05