UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NO.05-11738-EFH

Brendan M. McGUINNESS,
        Plaintiff,

vs.

James R. BENDER, et al.,
        Defendants.

═══════════════════════════

PLAINTIFF'S REPLY TO DEFENDANTS'
OPPOSITION AND CROSS-MOTION FOR
PARTIAL SUMMARY JUDGMENT.

Plaintiff brings the following reply as an opposition to
the defendants' motion for summary judgment in part, and also as
a rebuttal to some things argued by the defense.

1.) As addressed in the attached Motion to Strike, the defendants
    are relying mainly on hear-say and unproven allegations of
    bad conduct in their Memorandum of Law filed in support of
    their motion. Almost everything pointed to as a fact by the
    defendants (certainly any reference to any incident in the
    the county jails) is hotly disputed by plaintiff. Not one of
    those reports was adjudicated on its merits. It has no place
    at this stage of litigation.

2.) The defendants have argued that plaintiff has failed in some
    way to exhaust available administrative remedies as required
    by law prior to bringing suit in this Court. This claim is
    without merit. In fact, plaintiff has addressed his concerns
    to the highest administrative authorities ad nauseum. Please
    see Exhibit A, pp. 13-18 of Plaintiff's Motion for Partial
    Summary Judgment. Compare p. 23, id. ("After internal review
    your appeal is denied")(signed by defendant Bender). Moreover,

-1-

the grievance procedures specifically exempt disciplinary
matters from consideration; the disciplinary appeal process
is the equivalent of a formal grievance. All of the things
plaintiff complains of flowed from a disciplinary decision
which was upheld on appeal by defendant Bender.

3.) Plaintiff now sees that his claim that the nature of his
pretrial confinement at Souza-Baranowski's SMU (i.e. Special
Management Unit) constituted punishment  cannot be decided
at this stage of the litigation. The parties clearly do not
agree on the way such confinement can be properly character-
ized. While the parties are in agreement as to the proper
legal standard to be applied (both parties citing Bell v.
Wolfish, 441 U.S. 535 [197?] and Collazo-Leon v. Bureau of
Prisons, 51 F.3d 315 [1st Cir. 1995]), it is the specific
conditions of confinement upon which the Court will have to
base its decision. Such facts are neither agreed upon nor
even in the record at this time. Judgment on this issue is
inappropriate at present.

4.) The letter which the defense submits as proof that they had
the DA's permission to transfer plaintiff as G.L. c. 276,
section 52A demands is signed not by the DA, but by one of
his assistants. 52A mentions nothing about assistants. The
law was not complied with and the transfer was illegal.

5.) Plaintiff hereby drops his double jeopardy claim. It has
come to his attention that the second instance of jeopardy
is the one which must be attacked.

6.) Plaintiff pled guilty to the offenses charged in the two
disciplinary reports for which he was committed to the DDU
for five (5) years; the defense makes much of this, using
the plea to negate any claim that the process was not legally
sound. This is a specious argument. Plaintiff objected in
all ways available to him to the process itself; once the
motion to dismiss the reports (and the hearing itself) was

-2-

denied by the hearing officer, plaintiff's only chance for redress was the disciplinary appeal. The conduct of the hearing is irrelevant to a claim that the hearing itself should not have occurred based on time considerations and plaintiff's having left custody, etc. Innocence or guilt has no bearing on whether due process considerations barred the hearing itself.

7.) The defendants' reference to Commonwealth v. Forte, 423 Mass. 672 (1996) on pp. 19 and 20 of their Memorandum is inapposite. Whereas Forte dealt with "wrongdoers" and the DOC's prerogative in making changes in their terms of confinement, plaintiff was a pretrial detainee at the time in question. The question of whether he was in fact a "wrongdoer" was an open one.

8.) 103 CMR 420.00 et seq. clearly states that sentenced inmates are to be sent to a certain prison and allowed to undergo a process of classification. The defendants have not classified plaintiff because they say "oh, we already knew what to do with him." They flaunt the regulations at whim; plaintiff, as a result, was placed in solitary confinement immediately upon sentencing. For the reasons outlined in his Motion for Partial Summary Judgment, plaintiff reiterates that his rights were violated; the result was atypical and significant hardship.

9.) In further support of his argument relative to Article XII of the Massachusetts Declaration of Rights, plaintiff submits the attached amici brief of CPCS and the ACLU in MacDougall v. Commonwealth, SJC-09509. The defendants mentioned this matter in their memorandum. (Addendum One.)

RESPECTFULLY SUBMITTED,

Brendan M. McGuinness
S.B.C.C.
P.O. BOX 8000
SHIRLEY, MA 01464

Dated: 4/24/06

cc. William Saltzman, Esq.
    file.

-3-

TO: KATHLEEN M. DENNEHY, DOC COMMISSIONER
FROM: BRENDAN M. McGUINNESS  W86294
  RE: 103 CMR 420.00 et seq. (Classification)
DATE: February 17th, 2006.

Dear Mrs. Dennehy:

    Hi. I'm writing to you yet again to complain of yet another violation
of my rights while in the custody of the Department of Correction. Since you
are the commissioner of correction, I would truly appreciate it if you would
see fit to reply to my complaint personally. In the recent past, I have been
ignored by your deputy, James Bender. On other occasions when either I or my
family have written to you, the responses we've met with by your staff here
at the prison level have been completely inadequate.

    Mrs. Dennehy, on September 28, 2005, I was sentenced to serve 3½ years
to 3½ years-and-one-day in prison by the superior court for Norfolk County.
103 CMR 420.08 demands that:

              "Upon commitment to the (DOC), each inmate shall be
              admitted to a Reception Center where he or she will
              undergo an initial classification process."

I was never admitted to a Reception Center upon sentencing; I was never put
through the classification process outlined in the above regulation. As you
are well aware, these regulations have the force of law and are binding upon
the agency which promulgated them---i.e. the DOC. "The process will provide
an opportunity for the Reception Center staff members to become acquainted
with each inmate through individual assessment, testing, and structured inter-
views. As part of the process, each inmate should receive an oral and written
orientation to the policies and program opportunities of the Department."

    The "Initial Classification Process" outlined in section 420.08 provides
a very clear set of strictures for assessing how to deal with new commitments
to the DOC. I was denied all of the protections of your laws. When I wassent
to prison on 9/28/05, your Department simply by-passed the law and placed me
directly into a maximum-security prison; I was then placed directly into the
Department Disciplinary Unit ("DDU") to serve a sanction which the DOC had
imposed upon me while I was a pretrial detainee. This is all illegal for the
myriad reasons (all of which you will find I have outlined in correspondence
to your designees and subordinates if you'll peruse my file) I've submitted to

-1-

Deputy Bender, but it is just as clear from looking at the relevant state law regulations governing the classification of inmates upon sentencing that the manner in which I have been summarily designated "DDU status" represents a clear and blatant violation of my substantive due process rights as a newly committed prisoner.

For five (5) months now I have been in your custody as a sentenced inmate and I have not received any of the process outlined in 103 CMR 420.08; I have not been assessed to determine what (if any) specific needs I may have and how best to deal with them. In short, without classifying me, how can anyone make a determination as to how best to deal with me, where I should be housed, etc. Your staff have consigned me to punitive segregation for the duration of my entire sentence based upon events from the pretrial period.

Section 420.10 provides a seldom-used but viable option for classifying and placing inmates who, inter alia, "present difficult placement issues." I take it from the very existence of a "Department Review Board" that placement of inmates is a decision which merits the attention of an entire board of competent personnel. So how is it that I have been allowed to enter the DOC and disappear to solitary confinement without so much as an initial classification? There is an actual regulation requiring such initial classification; and subsequent classification (see 103 CMR 420.09).

I will also send a copy of this letter to Anthony Mendonsa, the Deputy of Classification here at Souza-Baranowski Correctional Center. You are holding me as a DDU prisoner for something that happened before I was ever even in DOC custody as a sentenced prisoner.

Please address the complete absence of any classification process as the law (103 CMR 420.00 et seq.) mandates.   Thank you for your time and attention to this matter.

RESPECTFULLY SUBMITTED,

Brendan M. McGuinness W86294
S.B.C.C.
P.O. BOX 8000
SHIRLEY, MA  01464-8000

cc. Anthony Mendonsa, SBCC
    file.

-2-



**Mass.**Gov · mass.gov home · online services · state agencies    SEARCH MASS.GOV

**Massachusetts**
# Department of Correction

Michael T. Maloney, Commissioner    Kathleen M. Dennehy, Deputy Commissioner

Home
Mission
Intelligence
**Policies**
Facilities
Security Levels
Superior
Technical Services
Business Services
Victim Services
Domestic Violence
Inmate Banking
**Research and Stats**
Most Wanted
MassCor
Employment
FAQ
**Media Releases**
EOPS
**Related Links**
Visiting/Directions
Locate Inmate
Privacy Policy


Facts About
Death Penalty
In Massachusetts

Site Map

# Security Levels

Level Six | Level Five | Level Four | Level Three | Level Two | Level One
Definition: Design Capacity, Facility Count

**Level Six.** A custody level in which both design/construction as well as inmate classification reflect the need to provide maximum external and internal control and supervision of inmates primarily through the use of high security parameters and extensive use of internal physical barriers and check points. Inmates accorded this status present serious escape risks or pose serious threats to themselves, to other inmates, to staff, or the orderly running of the institution. Supervision of inmates is direct and constant.
**Level Six Facilities**: MCI-Cedar Junction, Souza-Baranowski Correctional Center.

**Level Five.** A custody level in which design/construction as well as inmate classification reflect the need to provide maximum external and internal control and supervision of inmates. Inmates accorded to this status may present an escape risk or pose a threat to other inmates, staff, or the orderly running of the institution, however, at a lesser degree than those at level 6. Supervision remains constant and direct. Through an inmates willingness to comply with institutional rules and regulations, increased job and program opportunities exist.
**Level Five Facility:** Old Colony Correctional Center.

**Level Four.** A custody level in which both the design/construction as well as inmate classification reflect the goal of restoring to the inmate some degree of responsibility and control of their own behavior and actions, while still insuring the safety of staff and inmates. Design/construction is generally characterized by high security parameters and limited use of internal physical barriers. Inmates at this level have demonstrated the ability to abide by rules and regulations and require intermittent supervision. However, behavior in the community, i.e., criminal sentence and/or the presence of serious outstanding legal matters indicate the need for some control and for segregation from the community. Job and program opportunities exist for all inmates within the perimeter of the facility.
**Level Four Facilities**: Bay State Correctional Center, Bridgewater State Hospital, MCI-Concord, Massachusetts Treatment Center, MCI-Norfolk, North Central Correctional Institution, Shattuck Hosp. Correctional Unit.
**Level Four/Three:** MCI-Shirley Complex, Massachusetts Alcohol and Substance Abuse Center.

**Level Three.** A custody level in which both the design/construction as well as inmate classification reflect the goal of returning to the inmate a greater

COMMONWEALTH OF MASSACHUSETTS

SUPREME JUDICIAL COURT

NORFOLK COUNTY                                    NO. 09509


MARK MACDOUGALL

V.

COMMONWEALTH

---

ON APPEAL FROM A JUDGMENT OF THE
SINGLE JUSTICE OF THE SUPREME JUDICIAL COURT

---

BRIEF AND RECORD APPENDIX OF THE COMMITTEE
FOR PUBLIC COUNSEL SERVICES AND THE AMERICAN
CIVIL LIBERTIES UNION OF MASSACHUSETTS AS
AMICI CURIAE IN SUPPORT OF THE PETITIONER

---

PETER M. ONEK
BBO #552993
COMMITTEE FOR PUBLIC COUNSEL SERVICES
Public Defender Division
44 Bromfield Street
Boston, Massachusetts 02108
(617) 482-6212

JOHN REINSTEIN
BBO #416120
ACLU OF MASSACHUSETTS
211 Congress Street
Boston, Massachusetts 02110
(617) 482-3170

December, 2005.

-i-

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................iii

ISSUES PRESENTED................................. 1

STATEMENT OF THE INTEREST OF AMICI CURIAE........ 1

STATEMENT OF THE CASE........................... 4

STATEMENT OF FACTS.............................. 5

ARGUMENT

    I. THE SINGLE JUSTICE ERRED WHEN HE
       DENIED THE PETITION OF APPELLANT
       MACDOUGALL, A PRETRIAL DETAINEE,
       CLAIMING THAT HIS RIGHT TO DUE
       PROCESS WAS VIOLATED WHEN HE WAS
       TRANSFERRED FROM A COUNTY JAIL TO
       A MAXIMUM-SECURITY STATE PRISON
       WITHOUT AN EVIDENTIARY HEARING AND
       FINDINGS OF FACT BY A JUDGE................ 6

      A.  Introduction........................... 6

      B.  The transfer of a pretrial
         detainee from a county jail
         to a maximum-security state
         prison jeopardizes important
         constitutional rights................. 7

      C.  In light of the constitutional
         rights at stake, G.L. c.276,
         §52A, should be read as pre-
         cluding the transfer of a pre-
         trial detainee to state prison
         without an evidentiary hearing
         and findings of facts by a judge.......11

      D.  The facial language of the
         statute supports MacDougall's
         position..............................14

      E.  Discussion of the relationship
         to this case of the jurispru-
         dence regarding change of venue
         of criminal trials....................16

      F.  Conclusion............................18

-ii-

II.  THE SINGLE JUSTICE ERRED WHEN HE
     DENIED MACDOUGALL'S PETITION
     CLAIMING THAT HIS TRANSFER FROM A
     COUNTY JAIL TO A MAXIMUM-SECURITY
     STATE PRISON, WHILE HE WAS STILL A
     PRETRIAL DETAINEE, WAS A VIOLATION
     OF HIS RIGHT TO DUE PROCESS BECAUSE
     IT SUBJECTED HIM TO "INFAMOUS
     PUNISHMENT" EVEN THOUGH HE HAD NOT
     BEEN CONVICTED OF ANY CRIME...............18

     A.   Introduction..........................18

     B.   The Souza-Baranowski Correctional
          Center is tantamount to "the
          state prison".........................20

     C.   MacDougall's treatment at Souza-
          Baranowski is indistinguishable
          from that experienced by the
          convicted inmates who are serving
          their sentences there.................21

     D.   Amici note the equal protection
          implications of this matter...........22

     E.   Conclusion............................23


III. ASIDE FROM AN ORDER BY THIS COURT
     THAT MACDOUGALL BE RETURNED FORTH-
     WITH TO THE NORFOLK COUNTY JAIL,
     THERE DOES NOT EXIST ANY ADEQUATE
     ALTERNATIVE REMEDY FOR THE DEPRIVATION
     OF DUE PROCESS THAT MACDOUGALL HAS
     ENDURED...................................24

CONCLUSION.......................................26

ADDENDUM.........................................27

CERTIFICATE OF COMPLIANCE........................36

RECORD APPENDIX..................................37

-iii-

TABLE OF AUTHORITIES

Cases

Bell v. Wolfish,
   441 U.S. 520 (1974)............................19, 20

Board of Educ. v. Assessor of Worcester,
   368 Mass. 511 (1975)............................12

Brown v. Commissioner of Correction,
   394 Mass. 89 (1985)............................19, 20

Cobb v. Aytch,
   643 F.2d 946 (3d Cir. 1981)................... 8, 9

Commonwealth v. Arment,
   412 Mass. 55 (1992)............................23

Commonwealth v. Brogan,
   415 Mass. 169 (1993)...........................17

Commonwealth v. Kennedy,
   435 Mass. 527 (2001)...........................12

Commonwealth v. Koney,
   421 Mass. 295 (1995)...........................15

Commonwealth v. McLeod,
   437 Mass. 286 (2002)...........................12

Commonwealth v. Morales,
   440 Mass. 536 (2003)...........................17

Commonwealth v. Smith,
   357 Mass. 168 (1970)...........................17

Commonwealth v. Smith,
   431 Mass. 417 (2000)...........................12

Covino v. Vermont Department of Correction,
   933 F.2d 128 (2nd Cir. 1991).................. 8

Crocker v. Superior Court,
   208 Mass. 162 (1911)...........................17, 18

Gerstein v. Pugh,
   420 U.S. 103 (1975)...........................20

-iv-

Ingraham v. Wright,
  430 U.S. 651 (1977)...........................19

Jones v. Robbins,
  8 Gray 329 (1857)............................19

Kadrmas v. Dickinson Public Schools,
  487 U.S. 450 (1988)..........................23

Kennedy v. Mendoza-Martinez,
  372 U.S. 144 (1963)..........................19

Lee v. Commissioner of Revenue,
  395 Mass. 527 (1985).........................23

San Antonio Independent School District
  v. Rodriquez, 411 U.S. 1 (1973)..............23

Virginia v. Paul,
  148 U.S. 107 (1893)..........................20

Wong Wing v. United States,
  163 U.S. 228 (1896)..........................20

## Constitutional Provisions

United States Constitution

  Fourteenth Amendment.........................19, 22, 27

Massachusetts Declaration of Rights

  Article 1....................................23, 27

  Article 12...................................19, 20, 27

  Article 13...................................17, 28

## Statutes

G.L. c.127, §22 (2004 ed.).....................11, 12, 13,
                                               28
G.L. c.276, §52A (2004 ed.)....................passim

-v-

## Other Authorities

Black's Law Dictionary (5th Ed. 1979) ............14

Boston Globe, August 24, 2003 ....................11

Massachusetts Department of Correction,
    "Correctional Institution/Security Levels"
    (103 DOC 101) .................................10, 30

-1-

## ISSUES PRESENTED

1.   Whether the single justice erred when he denied the petition of appellant MacDougall, a pretrial detainee, claiming that his right to due process was violated when he was transferred from a county jail to a maximum-security state prison without an evidentiary hearing and findings of fact by a judge.

2.   Whether the single justice erred when he denied MacDougall's petition claiming that his transfer from a county jail to a maximum-security state prison, while he was still a pretrial detainee, was a violation of his right to due process because it subjected him to "infamous punishment" even though he had not been convicted of any crime.

3.   Whether, aside from an order by this Court that MacDougall be returned forthwith to the Norfolk County jail, there exists any adequate alternative remedy for the deprivation of due process that MacDougall has endured.

## STATEMENT OF THE INTEREST OF AMICI CURIAE

### Committee for Public Counsel Services

The Committee for Public Counsel Services (CPCS), the Massachusetts public defender agency, represents

-2-

indigent defendants in criminal trials.  CPCS submits
this brief in support of the contentions of petitioner
Mark MacDougall (1) that his right to due process was
violated when he was transferred from a county jail to
a maximum-security state prison without an evidentiary
hearing and findings of fact by a judge; and (2) that
his transfer also violated his right to due process by
subjecting him to "infamous punishment," even though he
had not been convicted of any crime.

These issues are of great importance to CPCS,
because many of its clients, by virtue of their
indigency, are unable to post bail while awaiting trial
and, therefore, experience protracted pretrial
detention, during which they are subject to transfer
from institution to institution.  Such multiple
transfers can cause serious harm to the liberty
interests of CPCS's clients in a number of respects,
including (1) disruption of communication between
clients and their attorneys at critical junctures
(e.g., during discovery, pretrial motion filing, and
trial preparation); and (2) exposure of clients to
serious physical harm as a result of their being
intermingled with convicted felons, including those who
have been found guilty of the most serious crimes of
violence.

-3-

## American Civil Liberties Union of Massachusetts

The American Civil Liberties Union of Massachusetts
(ACLUM), an affiliate of the American Civil Liberties
Union, is a statewide, nonprofit organization with a
membership of over 20,000, which is dedicated to the
preservation and protection of the rights and liberties
protected by the United States Constitution and the
Constitution of the Commonwealth.  The ACLU has a long
history of concern for the right to counsel and for the
rights of prisoners, and has participated in a number
of cases in this Court, both through direct represen-
tation and as amicus curiae.  Through its represen-
tation of county jail prisoners over the course of the
past thirty years, the ACLU is familiar with the prac-
tice of transferring pretrial detainees and sentenced
prisoners and has received reports of numerous instances
of the arbitrary use of this practice for punitive
purposes.

Amici urge this Court to rule (1) that a pretrial
detainee may not be transferred from a jail to any
other correctional institution except by court order
following formal proceedings that comport with due
process, including an evidentiary hearing and factual
findings by a judge; and (2) that, in any event, a

-4-

pretrial detainee may not be transferred from a jail to
a maximum-security state prison, because such transfer
subjects the detainee to "infamous punishment" even
though he has not been convicted of any crime.

## STATEMENT OF THE CASE

Amici hereby augment the statement of the case set
forth in MacDougall's appellate brief with the following
information.

This case involves an appeal from the denial by
the single justice of MacDougall's petition, pursuant
to G.L. c.211, §3, challenging the constitutionality of
G.L. c.276, §52A. Pursuant to that statute, the
Commonwealth is holding MacDougall in a maximum-
security state prison, even though he is still a
pretrial detainee. This Court's order pursuant to Rule
2:21, permitting MacDougall to appeal the single
justice's denial, was issued on July 29, 2005 (R.A. 57-
58).[1]/ MacDougall filed his appellate brief in this
Court on October 17, 2005 (A.A. 3). The Commonwealth's
brief in response to MacDougall's is due on February
17, 2006 (id.).

---

[1]/The Record Appendix to MacDougall's appellate brief
will be cited herein as "(R.A.   )" and the text of the
brief as "(M.Br. __)." The appendix to the present
brief will be cited as "(A.A. __)."

-5-

Except at the time of filing of his original
Superior Court motion challenging his transfer to state
prison, MacDougall has acted pro se throughout this
matter.

## STATEMENT OF FACTS

Amici hereby augment the statement of facts set
forth in MacDougall's appellate brief with the
following excerpt from this Court's order of July 29,
2005, permitting MacDougall to appeal from the single
justice's denial of his petition.

> In 2002, [MacDougall] was indicted for
> certain felonies and held in the Norfolk
> County correctional facility in lieu of bail.
> While he was there, he allegedly assaulted a
> correctional officer.  He was indicted for
> that offense and related offenses and ordered
> held without bail.  He was subsequently
> transferred to the Plymouth County
> correctional facility and ultimately to the
> State prison at Cedar Junction, all while the
> various charges against him were pending.  A
> Superior Court judge denied his motion to
> transfer him to a jail or correctional
> institution while awaiting trial.  This
> petition and appeal followed.

(R.A. 59)

-6-

ARGUMENT

I.

THE SINGLE JUSTICE ERRED WHEN HE DENIED THE PETITION OF
APPELLANT MACDOUGALL, A PRETRIAL DETAINEE, CLAIMING
THAT HIS RIGHT TO DUE PROCESS WAS VIOLATED WHEN HE WAS
TRANSFERRED FROM A COUNTY JAIL TO A MAXIMUM-SECURITY
STATE PRISON WITHOUT AN EVIDENTIARY HEARING AND
FINDINGS OF FACT BY A JUDGE.

A.   Introduction.

In this matter, one of first impression, Amici

strongly support MacDougall's contention that he should

not have been transferred from a county jail to a

maximum-security state prison without a court order

following an evidentiary hearing and findings of fact

by a judge (M.Br. 2-5).  In rejecting MacDougall's

petition regarding this matter, pursuant to G.L. c.211,

§3, the single justice implicitly endorsed the Superior

Court judge's ruling on MacDougall's motion for relief, [2/]

which is set forth in its entirety below.

> G.L. c.276[,] §52A[,] does not require an
> order of this court to transfer a pre-trial
> detainee from a jail to a correctional
> facility, if the detainee is otherwise
> eligible for transfer to a prison.  The
> statute merely sets forth an alternative
> means by which a detainee may be transferred,
> i.e., by order of the court.  It does not
> imply that a court order is the only way such

---

[2/]The single justice's terse rejection of petitioner's
petition did not include any explanation for that
ruling (R.A. 48).

a transfer may be lawfully accomplished.

(R.A. 24). As this ruling was deeply flawed, the single justice erred in finding it unobjectionable.

In the following sections, Amici discuss several aspects of this matter that they wish to call to this Court's attention.

B.  The transfer of a pretrial detainee
    from a county jail to a maximum-
    security state prison jeopardizes
    important constitutional rights.

Several critical constitutional rights of a pretrial detainee are threatened by the transfer of the detainee from a county jail to a maximum-security state prison. Such a transfer can significantly disrupt communication between the detainee and his attorney during the period when critical decisions must be made regarding discovery, the locating and interviewing of witnesses, the filing of motions to suppress or to dismiss, potential plea negotiations, and the develop- ment of a strategy for the defense at trial. The detainee can ill afford to be shuttled back and forth among institutions during this period, such that cor- respondence from attorney to client may go unforwarded and important documents in the detainee's possession may be lost. These circumstances seriously impinge

-8-

upon a detainee's liberty interests, specifically, his
constitutional rights to have the effective assistance
of counsel, to present a defense, and to have a speedy
trial.

In <u>Cobb</u> v. <u>Aytch</u>, 643 F.2d 946, 957-960 (3d Cir.
1981), the transfer of pretrial detainees to other,
distant facilities was deemed to have interfered with
their access to counsel, thereby violating their
federal constitutional rights to the effective
assistance of counsel and to a speedy trial.[3/]    The
Court in <u>Cobb</u> forcefully described the detainees'
deprivation thus:

> [The transfers] seriously impinged upon their
> personal liberty as protected by the speedy
> trial clause not only by prolongation of
> detention, but also by removing defendants
> from proximity to potential witnesses.    The
> drastic reduction in visits by family and
> friends which the trial court found to be the
> result of the transfers obviously curtailed
> the ability of the defendants to communicate
> with potential witnesses through those most
> likely to be willing to assist.    And, while
> the transfers interfered with what the
> prisoners could do to help themselves, they
> interfered even more drastically with what
> counsel might have been able to do for
> them....    Most [detainees] ... represented by
> the [public defender's office] were deprived

---

[3/]See <u>Covino</u> v. <u>Vermont Department of Correction</u>, 933
F.2d 128, 130 (2nd Cir. 1991) (remanding for deter-
mination whether transfer of pretrial detainee to
different institution "unconstitutionally impaired
[his] sixth amendment right of access to his trial
counsel").

-9-

> of pretrial interviews.  The trial court
> concluded "that in most instances a transfer
> would violate the pretrial detainee's due
> process rights and subject him or her to
> serious harm such as not being able to
> prepare a criminal defense"....

Cobb, 643 F.2d at 960.

In the case at bar, MacDougall's trial preparation
has been punctuated by a dizzying itinerary through the
correctional system.  Since his initial detention on
his underlying charges in the Norfolk County jail, he
has been transferred on three different occasions to
the Plymouth County Correctional Facility and once to
the Bristol County Correctional Facility (R.A. 20 n.4),
thence to the state prison in Walpole (Cedar Junction),
thence to M.C.I.-Norfolk, and finally to his present
location, the Souza-Baranowski Correctional Center in
Shirley (A.A. 1).

In addition to the detriment to MacDougall's trial
preparation, his transfer to a maximum-security state
prison has affected his most precious constitutional
right, his right to physical safety.  MacDougall's
detention at Souza-Baranowski exposes him to physical
harm at the hands of some of the most violent convicts
in the correctional system.  According to the
Department of Correction's scale for rating the
security levels of its institutions, Souza-Baranowski

-10-

is a "Level 6" institution.  Level 6 is the highest

security category; only two institutions occupy that

level, Souza-Baranowski and "the state prison" at

Walpole (Cedar Junction).  See the Department's policy

statement, 103 DOC 101 (entitled "Correctional

Institution/Security Levels"), set forth in the

Addendum, below, at pages 30-35.  That document's

summary of the system's six security levels includes

(at page 34) the following description of Level 6,

which gives a flavor of the harsh reality facing

inmates who find themselves incarcerated at this level.

> A security level in which both design/
> construction as well as inmate classifica-
> tion, reflect the need to provide maximum
> external and internal control and supervision
> of inmates primarily through the use of high
> security perimeters and extensive use of
> internal physical barriers and check points.
> Inmates within this security level present
> serious escape risks or pose serious threats
> to themselves, to other inmates, to staff, or
> the orderly running of the institution.
> Supervision of inmates is direct and
> constant.

Supplementing this document's abstract language

regarding physical danger is the handwritten letter that

MacDougall sent to Chief Justice Marshall from the state

prison at Cedar Junction on May 16, 2005, requesting

that this Court allow him to proceed with his appeal

under Rule 2:21.  In the letter, MacDougall states,

-11-

"Not only are my substantive rights being violated, but
just being in Walpole puts my life in jeopardy simply
by the class of convicts held in this institution"
(A.A. 6). Those words could just as well have been
written from MacDougall's cell at Souza-Baranowski, the
institution where former priest John J. Geoghan met his
untimely, violent end. See Boston Globe, Aug. 24,
2003, at A1 ("Ex-Priest Geoghan Attacked, Dies").

     C.   In light of the constitutional
         rights at stake, G.L. c.276, §52A,
         should be read as precluding the
         transfer of a pretrial detainee
         to state prison without an eviden-
         tiary hearing and findings of fact
         by a judge.

It is inferable that the Legislature, in enacting
the second sentence of G.L. c.276, §52A, authorizing
the transfer of a pretrial detainee from a county jail
to a maximum-security state prison, would have been
aware that such a transfer raises serious constitu-
tional concerns. That is because, at the time of that
enactment,[4] there already existed another statute,
G.L. c.127, §22, directing that, in a county jail,
"[p]ersons committed on charge of crime shall not be

---

[4]/The second sentence of G.L. c.276, §52A, authorizing
the transfer of a pretrial detainee from a county jail
to a state correctional institution, was inserted in
1971.

-12-

<u>confined</u> <u>with</u> <u>convicts</u>...." (emphasis added).<u>5/</u>  The

imperative language ("shall not") of G.L. c.127, §22,

see <u>Commonwealth</u> v. <u>Kennedy</u>, 435 Mass. 527, 530 (2001)

("[t]he word 'shall' ... indicates that the action is

mandatory"), strongly suggests that the Legislature

viewed the mingling of pretrial detainees with

convicted inmates as fundamentally unacceptable.  Under

well-established rules of statutory construction, it

must be assumed (1) that the Legislature was cognizant

of the substance of G.L. c.127, §22, when, in 1971, the

second sentence of G.L. c.276, §52A, was inserted (see

<u>Commonwealth</u> v. <u>McLeod</u>, 437 Mass. 286, 290 [2002])

["Courts presume that the Legislature is aware of

existing statutes when it amends a statute or enacts a

new one"]); and (2) that the Legislature understood

that the two statutes would have to be harmonized to

produce a coherent statutory scheme.  See <u>Commonwealth</u>

v. <u>Smith</u>, 431 Mass. 417, 424 (2000), quoting from <u>Board</u>

<u>of Educ.</u> v. <u>Assessor of Worcester</u>, 368 Mass. 511, 513-

514 (1975) ("statutes which relate to a common subject

matter 'should be construed together so as to

---

5/The office of legal counsel to the Norfolk County
Sheriff has informed Amici that, based on the authority
of G.L. c.127, §22, it is the official policy of the
Sheriff to isolate pretrial. detainees from convicted
inmates at the House of Correction complex in Dedham.

-13-

constitute an harmonious whole'").

In light of the Legislature's solicitude towards pretrial detainees in the jail context (G.L. c.127, §22), it is difficult to discern how that statute can be harmonized with G.L. c.276, §52A, which authorizes the transfer of pretrial detainees into the midst of a maximum-security state prison population of convicted felons. If such harmonization is possible at all, it must be on the basis that transfers to state prison should not occur unless preceded by a judicial hearing, including the presentation of evidence, a strong showing of necessity by the Commonwealth, and factual findings by the judge sufficient to justify a transfer order.

The Superior Court judge in this case violated MacDougall's right to due process when she denied his motion to be returned to the Norfolk County jail on the ground that "[t]he statute [G.L. c.276, §52A] merely sets forth an alternative means by which a detainee may be transferred...." (R.A. 24). Neither the judge nor the language of §52A suggests what a proper alternative to a court order might be. The judge's flawed inter-pretation of the statute is an open invitation to arbitrary transfers based on the caprice of a pretrial detainee's jailers or the employees of the district attorney's office.

-14-

### D.   The facial language of the statute supports MacDougall's position.

The facial language G.L. c.276, §52A, contains two specific indications that the Legislature intended that the transfer of a pretrial detainee to state prison be preceded by a judicial hearing comporting with basic principles of due process.  First, the statute states that "[t]he proceedings for such removals [from jail to state correctional institution] shall be the same as for the removal of prisoners from one jail or house of correction to another" (emphasis added).  The explicit reference to "proceedings" surely refers to formal, orderly procedures of some sort.  See Black's Law Dictionary (5th ed. 1979) (defining "proceeding" thus: "[T]he form and manner of conducting juridical business before a court or judicial officer.  Regular and orderly progress in form of law, including all possible steps in an action from its commencement to the execution of judgment.  Term also refers to administrative proceedings before agencies, tribunals, bureaus, or the like").  Moreover, the imperative statutory language ("shall be the same") expressly directs that such transfer procedures be uniform across the correctional system (i.e., in both jail-to-jail transfers and jail-to-state institution transfers).

-15-

The second aspect of the facial language of G.L. c.276, §52A, that supports MacDougall's position is the statement that pretrial detainees are subject to transfer to state prison "if they have been previously incarcerated in a correctional institution of the commonwealth under sentence for a felony...." Whether or not a pretrial detainee satisfies this condition for transfer is a question of fact, as to which there may be some dispute. Such a dispute may involve complexities that can only be definitively resolved by a judge, an impartial "referee" of factual disagreements between parties to litigation. See Commonwealth v. Koney, 421 Mass. 295, 301 (1995) (at trial on subsequent offense portion of indictment, evidence insufficient to identify defendant as perpetrator of prior offense, despite Commonwealth's introduction of documents purportly showing prior conviction of person bearing defendant's precise name). It would be unseemly (indeed, unconstitutional) for such a question to be resolved unilaterally by the pretrial detainee's jailer or an employee of the district attorney's office, either of whom might have questionable motives for wanting to remove the detainee to a distant place of detention. [6/]

---

[6/]Precisely because of the "local" character of county
(FOOTNOTE CONTINUED ON NEXT PAGE)

-16-

The need for resolution of factual disputes by a judge is borne out by this Court's own language summarizing the factual background of this case in the order permitting MacDougall's appeal to proceed.  There the Court properly acknowledged the uncertainty as to what actually happened: "While [MacDougall] was [in the Norfolk County jail], he _allegedly_ assaulted a correctional officer" (R.A. 59) (emphasis added).

   E. <u>Discussion of the relationship
      to this case of the jurispru-
      dence regarding change of venue
      of criminal trials</u>.

The principles governing change of venue of criminal trials shed useful light on the present issue, which involves, in essence, the repeated change of venue of MacDougall's detention prior to his trial. One of the basic principles of our legal system is that criminal trials generally occur in the venue where the alleged offense occurred.  In a venerable line of cases, this Court has repeatedly opined that "[t]he power of the court to allow a change as to the place of

---

6/ (FOOTNOTE CONTINUED FROM PREVIOUS PAGE)
jails, sheriffs' departments, and district attorneys'
offices, it is not inconceivable that a jailer or
prosecutor will have had personal dealings with a
detainee or his family.  In such circumstances,
subjective biases could impinge on decision-making
regarding management of the jail population.

-17-

a trial by jury 'should be exercised with great caution and only after a solid foundation of fact has been first established.'" Commonwealth v. Smith, 357 Mass. 168, 173 (1970), quoting from Crocker v. Superior Court, 208 Mass. 162, 180 (1911). See Commonwealth v. Morales, 440 Mass. 536, 542 (2003). This principle has roots in art. 13 of the Massachusetts Declaration of Rights, which states, "In criminal prosecutions, the verification of facts in the vicinity where they happen, is one of the greatest securities of the life, liberty, and property of the citizen." See Common-wealth v. Brogan, 415 Mass. 169, 174 (1993) ("[o]ne concept underlying art. 13 is that fairness to a defendant normally requires that the defendant not be transported far away for trial but rather be tried where there is access to witnesses and evidence for the defense").

The gist of the jurisprudence of change of venue of criminal trials is that such change should be difficult to procure. Therefore, Amici contend, the venue of the pretrial detainee's detention -- which is so critical to his preparation for his trial -- should also be difficult to change. At the very least, the place of detention should not be changeable at the mere

-18-

whim of the jailer or the district attorney.  Rather,
any such change should be authorized "with great
caution and only after a solid foundation of fact has
been first established," <u>Crocker</u> v. <u>Superior Court</u>,
<u>supra</u>, 208 Mass. at 180, i.e., after an evidentiary
hearing and findings of fact by a judge.

    F.  <u>Conclusion</u>.

In sum, Amici contend that the single justice
erred in finding unobjectionable the Superior Court
judge's denial of MacDougall's motion to be transferred
back to the Norfolk County jail.  Therefore, the single
justice's ruling should be reversed.

II.

THE SINGLE JUSTICE ERRED WHEN HE DENIED MACDOUGALL'S
PETITION CLAIMING THAT HIS TRANSFER FROM A COUNTY JAIL
TO A MAXIMUM-SECURITY STATE PRISON, WHILE HE WAS STILL
A PRETRIAL DETAINEE, WAS A VIOLATION OF HIS RIGHT TO
DUE PROCESS BECAUSE IT SUBJECTED HIM TO "INFAMOUS
PUNISHMENT" EVEN THOUGH HE HAD NOT BEEN CONVICTED OF
ANY CRIME.

    A.  <u>Introduction</u>.

In this matter, also one of first impression,
Amici strongly support MacDougall's contention that,
quite apart from the issue of inadequate transfer
proceedings, his detention in a maximum-security state
prison constitutes inappropriate punishment, in

-19-

violation of his right to due process under the state
and federal constitutions (M.Br. 5-8). In support of
his state constitutional claim, MacDougall properly
relies upon this Court's decision in <u>Brown</u> v.
<u>Commissioner of Correction</u>, 394 Mass. 89, 91-94 (1985),
reaffirming the teaching of <u>Jones</u> v. <u>Robbins</u>, 8 Gray 329,
349 (1857), that, under art. 12 of the Massachusetts
Declaration of Rights, "punishment in the state prison
is an infamous punishment, and cannot be imposed
without both indictment and trial by jury." See art.
12 ("the legislature shall not make any law, that shall
subject any person to a capital or infamous punishment,
excepting for the government of the army and navy,
without trial by jury"). In support of his federal
constitutional claim, MacDougall properly relies upon
the U.S. Supreme Court's pronouncement in <u>Bell</u> v.
<u>Wolfish</u>, 441 U.S. 520 (1979), that,

> [i]n evaluating the constitutionality of
> conditions or restrictions of pretrial
> detention that implicate only the protection
> against deprivation of liberty without due
> process of law, we think that the proper
> inquiry is whether those conditions amount to
> punishment of the detainee. For under the
> Due Process Clause [of the Fourteenth
> Amendment], a [pretrial] detainee may not be
> punished prior to an adjudication of guilt in
> accordance with due process of law. See
> <u>Ingraham</u> v. <u>Wright</u>, 430 U.S. 651, 671-672
> n.40, 674 (1977); <u>Kennedy</u> v. <u>Mendoza-</u>
> <u>Martinez</u>, 372 U.S. 144, 165-167, 186 (1963);

-20-

> Wong Wing v. United States, 163 U.S. 228, 237
> (1896).  A person lawfully committed to pre-
> trial detention has not been adjudged guilty
> of any crime.  He has had only a "judicial
> determination of probable cause as a pre-
> requisite to [the] extended restraint of
> [his] liberty following arrest."  Gerstein v.
> Pugh, [420 U.S. 103,] 114 [1975]; see
> Virginia v. Paul, 148 U.S. 107, 119
> (1893)....  Under such circumstances, the
> Government concededly may detain him to
> ensure his presence at trial and may subject
> him to the restrictions and conditions of the
> detention facility so long as those
> conditions and restrictions do not amount to
> punishment, or otherwise violate the
> Constitution.

Bell v. Wolfish, id. at 535-537 (1979) (footnotes

omitted).

In the following sections, Amici discuss several

aspects of this matter that they wish to call to this

Court's attention.

> B.   The Souza-Baranowski Correctional
>      Center is tantamount to "the state
>      prison."

In Brown v. Commissioner of Correction, supra,

394 Mass. at 89, this Court opined that the maximum

security prison at Walpole (Cedar Junction) is "the

state prison," that incarceration there is by

definition "infamous punishment," and that such

incarceration would be a violation of art. 12 if it

were not the result of indictment and conviction of the

inmate.  As noted in Argument I, above, Cedar Junction

-21-

carries the highest security designation in the state
correctional system, Level 6. Only one other prison is
a Level 6, the Souza-Baranowski Correctional Center,
where MacDougall is presently being held. Therefore,
for purposes of assessment of MacDougall's appellate
claim in the present matter, Souza-Baranowski should be
considered the equivalent of "the state prison."

    C.  <u>MacDougall's treatment at Souza-
        Baranowski is indistinguishable
        from that experienced by the
        convicted inmates who are serving
        their sentences there</u>.

    MacDougall's detention at the Souza-Baranowski
Correctional Center -- amidst the population of
convicted felons who are serving their sentences there
-- constitutes punishment. He is not being treated
with any special solicitude by virtue of his pretrial
status. See MacDougall's petition pursuant to G.L.
c.211, §3, par. 13 (describing his "conditions of
confinement as a pretrial detainee in the state prison
[as] identical to those of a convicted felon, sentenced
to the state prison as punishment") (R.A. 29).[2/]
Whatever it is about the daily prison regimen at Souza-

---

[2/]When MacDougall wrote those words, he was incar-
cerated at Cedar Junction (R.A. 32). There is nothing
in the record to suggest that his characterization of
his treatment at Souza-Baranowski would be any
different.

-22-

Baranowski that constitutes "punishment" of the
convicted inmates applies equally to MacDougall.   In
short, he is being punished, even though he has not
been found guilty of any crime.

D.   Amici note the equal protection
     implications of this matter.

Quite apart from the foregoing argument regarding
due process principles, Amici point out an equal-
protection problem with G.L. c.276, §52A, which,
although not raised by MacDougall below, merits this
Court's attention.  As noted above, §52A authorizes
transfer of a pretrial detainee to state prison only
where the detainee "ha[s] been previously incarcerated
in a correctional institution of the commonwealth under
sentence for a felony...."  Thus, the statute draws a
significant distinction between two groups of pretrial
detainees who are otherwise similarly-situated: those
who previously served time in a state institution and
those who did not.  Amici discern no rational basis for
drawing such a distinction, which imposes a very heavy
burden on the liberty interests of some detainees,
while sparing others.

The Fourteenth Amendment to the United States
Constitution guarantees that "[n]o State shall make or

-23-

enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws." See art. 1 of the Massachusetts Declaration of Rights. "State action violates equal protection rights if it subjects persons to classification resulting in different treatment," Commonwealth v. Arment, 412 Mass. 55, 63 (1992), without an adequate showing that the state has "a rational or conceivable basis" for the disparate treatment. Lee v. Commissioner of Revenue, 395 Mass. 527, 529-530 (1985). See San Antonio Independent School District v. Rodriquez, 411 U.S. 1, 17 (1973); Kadrmas v. Dickinson Public Schools, 487 U.S. 450, 457-458 (1988).

Under the foregoing authority, the distinction in G.L. c.276, §52A, between similarly-situated pretrial detainees, based solely on the happenstance of whether they previously have served a felony sentence in a state institution, is truly irrational. Therefore, MacDougall's right to equal protection of the laws has been violated.

E. Conclusion.

In sum, Amici contend that the single justice erred in endorsing the Superior Court judge's denial of MacDougall's motion to be transferred back to the

-24-

Norfolk County jail.  Therefore, the single justice's
ruling should be reversed.

### III.

ASIDE FROM AN ORDER BY THIS COURT THAT MACDOUGALL BE
RETURNED FORTHWITH TO THE NORFOLK COUNTY JAIL, THERE
DOES NOT EXIST ANY ADEQUATE ALTERNATIVE REMEDY FOR THE
DEPRIVATION OF DUE PROCESS THAT MACDOUGALL HAS ENDURED.

In its order of July 29, 2005, granting MacDougall
permission to proceed with his appeal from the single
justice's ruling, this Court directed the parties to

> address in their briefs whether adequate
> alternative remedies exist, including but not
> necessarily limited to whether MacDougall is
> or should be entitled to a direct appeal to
> the Appeals Court from the denial of his
> interlocutory motion to transfer, or whether
> a separate civil action commenced in the
> Superior Court challenging the transfer would
> suffice.

(R.A. 60)

Amici support MacDougall's contention that there
is no adequate alternative remedy available at this
time (M.Br. 8-9).  A direct appeal from the judge's
ruling to the Appeals Court would be inappropriate for
two reasons.  First, it is Amici's experience that,
generally speaking, the "life cycle" of an appeal is
longer in the Appeals Court than in this Court.
Therefore, a remand or transfer of the case to the
Appeals Court would almost surely add a substantial

-25-

amount of time to the period of deprivation that
MacDougall is experiencing.  To MacDougall, every day
spent at Souza-Baranowski Correctional Center
constitutes additional "infamous punishment," as well as
an increased potential for physical harm and disruption
of planning for trial.  As MacDougall put it in his
brief, "[t]he pivotal point" here is "how long will
justice be delayed" (M.Br. 8-9) (footnote omitted).
Moreover, as this important matter is one of first
impression in this jurisdiction, this Court, as the
highest authority in the jurisdiction, should render a
decision which definitively interprets G.L. c.276,
§52A, and resolves the issues in this case.

     Amici also agree with MacDougall's rejection of
the notion of seeking redress through a civil action in
the Superior Court.  Such a course would very likely be
even more time consuming than would a remand directly
to the Appeals Court.  Again, it cannot be emphasized
too strongly that time is of the essence to MacDougall.
Moreover, the Superior Court (Dortch-Okara, J.) has
already had an opportunity to interpret G.L. c.276,
§52A, and has rendered the flawed ruling which
underlies the present appeal.

-26-

## CONCLUSION

In light of the foregoing Arguments, Amici urge this Court (1) to rule that the single justice erred in denying MacDougall's petition pursuant to G.L. c.211, §3; (2) to order that MacDougall be returned forthwith to the Norfolk County jail; and (3) to order that no further transfer of MacDougall to any other correctional institution (county or state) occur unless by court order, preceded by an evidentiary hearing and findings of fact by a judge.

Respectfully submitted,

PETER M. ONEK
BBO #552993
COMMITTEE FOR PUBLIC COUNSEL SERVICES
Public Defender Division
44 Bromfield Street
Boston, Massachusetts 02108
(617) 482-6212

JOHN REINSTEIN
BBO # 416120
ACLU OF MASSACHUSETTS
211 Congress Street
Boston, Massachusetts 02110
(617) 482-3170

December, 2005.

-27-

ADDENDUM

## United States Constitution

### Fourteenth Amendment, Section One

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

## Massachusetts Declaration of Rights

### Article 1

All people are born free and equal and have certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness. Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin.

### Article 12

No subject shall be held to answer for any crimes or offence, until the same is fully and plainly, substantially and formally, described to him; or be compelled to accuse, or furnish evidence against himself. And every subject shall have a right to produce all proofs, that may be favorable to him; to meet the witnesses against him face to face, and to be fully heard in his defence by himself, or his counsel, at his election. And no subject

-28-

shall be arrested, imprisoned, despoiled, or
deprived of his property, immunities, or
privileges, put out of the protection of the
law, exiled, or deprived of his life,
liberty, or estate, but by the judgment of
his peers, or the law of the land.

And the legislature shall not make any
law, that shall subject any person to a
capital or infamous punishment, excepting for
the government of the army and navy, without
trial by jury.

### Article 13

In criminal prosecutions, the
verification of facts in the vicinity where
they happen, is one of the greatest
securities of the life, liberty, and property
of the citizen.

### Massachusetts General Laws

#### Chapter 127, Section 22 (2004 ed.)

#### Separation of prisoners; minors.

Section 22.  Male and female prisoners
shall not be put or kept in the same room in
a jail or house of correction; nor, unless
the crowded state of the institution so
requires, shall any two prisoners, other than
debtors, be allowed to occupy the same room,
except for work.  Persons committed for debt
shall be kept separate from convicts and from
persons who are confined upon a charge of an
infamous crime.  Conversation between
prisoners in different apartments shall be
prevented.  Minors shall be kept separate
from notorious offenders and from persons
convicted of an infamous crime.  Persons
committed on charge of crime shall not be
confined with convicts, and prisoners charged
with or convicted of a crime not infamous
shall not be confined with those charged with
or convicted of an infamous crime, except

-29-

while at labor or assembled for moral or
religious instruction, at which time no
communication shall be allowed between
prisoners of different classes.

Chapter 276, Section 52A (2004 ed.)

Removal of Persons Held in Jail for Trial to a
Jail in Another County.

Section 52A.   Persons held in jail for
trial may, with the approval of the district
attorney, and shall, by order of a justice of
the superior court, be removed by the
commissioner of correction to a jail in
another county, and said commissioner shall,
at the request of the district attorney,
cause them to be returned to the jail whence
they were removed.   In addition, such
persons, if they have been previously
incarcerated in a correctional institution of
the commonwealth under sentence for a felony,
may, with the approval of the district
attorney, be removed by the commissioner of
correction to a correctional institution of
the commonwealth, and said commissioner
shall, at the request of the district
attorney, cause them to be returned to the
jail where they were awaiting trial.   The
proceedings for such removals shall be the
same as for the removal of prisoners from one
jail or house of correction to another.   The
cost of support of a person so removed and of
the removals shall be paid by the county
whence he is originally removed.

-30-

Massachusetts Department of Correction
Correctional Institution/Security Levels
103 DOC 101

Table of Contents

101.01   General Policy ........................................ 2

101.02   Institutional Responsibility .......................... 2

101.03   Security Level ........................................ 3

101.04   Massachusetts Correctional Institution
          /Security Designations .............................. 4

-31-

| MASSACHUSETTS DEPARTMENT OF CORRECTION | DIVISION: OFFICE OF THE DEPUTY COMMISSIONER |
|---|---|
| TITLE:  CORRECTIONAL INSTITUTIONS/SECURITY LEVEL | NUMBER: 103 DOC 101 |

**Purpose:** To establish a standard listing of each state correctional institution and its appropriate security level within the Department organization.

**References:** MGL Ch 124, section 1 (c) and (q)
ACA Standard

**Applicability:** Staff          **Public Access:** Yes

**Responsible Staff for Implementation and Monitoring of Policy:**

Commissioner
Superintendent

**Promulgation Date:** 01/18/2005          **Effective Date:** 02/17/2005

**Cancellation:** This policy cancels all Departmental policies, procedures, commissioner's bulletins and rules and regulations regarding the organizational history as it pertains to correctional institution status and placement within the Department.

**Severability Clause:** If any part of this policy is, for any reason, held to be in excess of the authority of the Commissioner, such decision will not affect any other part of this policy.

-32-

### 101.01  General Policy

1. The commissioner shall meet with each superintendent of a correctional institution at least semi-annually in order to facilitate communication, establish policy and explore problems, ensure conformity to legal and fiscal requirements, and implement programs.

2. The deputy commissioner, associate commissioner of administration, associate commissioner of reentry and reintegration, and general counsel shall meet with all institution superintendents at least twice per year to ensure that programs are being implemented as outlined in administrative policy, to discuss current issues, and to allow superintendents the opportunity for direct input into policy development.

3. Assistant deputy commissioners shall meet with all superintendents at least once per month to discuss issues relating to the operation of institutions under his/her control.

### 101.02  Institutional Responsibility

The superintendent of each institution is appointed by the commissioner of correction. Superintendents shall have, at a minimum, the following qualifications: a bachelor's degree in an appropriate discipline and demonstrated administrative ability and leadership. The degree requirements may be satisfied by completing a career development program that includes work-related experience, training, or college credits at a level of achievement equivalent to the bachelor's degree.

The superintendent shall execute his/her powers and duties subject to the authority and control of the commissioner of correction, and pursuant to M.G.L. Chapter 125, Section 14. The superintendent shall also be ultimately responsible for the overall functioning of the institution, including the supervision of:

1. Inmates
2. Institution personnel
3. Volunteers
4. All programs and activities connected with the institution.
5. All institution fiscal and budget matters.

-33-

## 101.03    Security Levels

1. **Level 1**

   This security level is the least restrictive in the department and is reserved for only those inmates who are at the end of their sentence and have been identified as posing little to no threat to the community. Supervision is minimal and indirect. Level 1 institutions are considered less secure institutions.

2. **Level 2**

   A security level in which both design/construction as well as inmate classification, reflect the goal of restoring to the inmate the maximum of responsibility and control of their own behavior and actions prior to release. Direct supervision of these inmates is not required, but intermittent observation may be appropriate under certain conditions. Inmates within this security level may be permitted to access the community unescorted to participate in programming to include, but not be limited to, work release, educational release, etc. Level 2 institutions are considered less secure institutions.

3. **Level 3**

   A security level in which both the design/construction as well as inmate classification, reflect the goal of returning to the inmate a greater sense of personal responsibility and autonomy while still providing for supervision and monitoring of behavior and activity. Inmates within this security level are not considered a serious risk to the safety of staff, inmates or the public. Program participation is mandated and geared toward their potential reintegration into the community. Access to the community is limited and under constant direct staff supervision. Level 3 institutions are considered less secure institutions.

4. **Level 4**

   A security level in which both the design/construction as well as inmate classification, reflect the goal of restoring to the inmate some degree of responsibility and control of their own behavior and actions, while still

-34-

insuring the safety of staff and inmates. Design/construction is generally characterized by high security perimeters and limited use of internal physical barriers. Inmates within this security level have demonstrated the ability to abide by rules and regulations and require intermittent supervision. However, behavior in the community, i.e., criminal sentence and/or the presence of serious outstanding legal matters, indicate the need for some control and for segregation from the community. Job and program opportunities exist for all inmates within the perimeter of the facility. Level 4 institutions are considered secure institutions.

5. **Level 5**

A security level in which design/construction as well as inmate classification, reflect the need to provide maximum external and internal control and supervision of inmates. Inmates within this security level may present an escape risk or pose a threat to inmates, staff, or the orderly running of the institution, however, at a lesser degree than those at level 6. Supervision remains constant and direct. Through an inmates' willingness to comply with institutional rules and regulations, increased job and program opportunities exist. Level 5 institutions are considered secure institutions.

6. **Level 6**

A security level in which both design/construction as well as inmate classification, reflect the need to provide maximum external and internal control and supervision of inmates primarily through the use of high security perimeters and extensive use of internal physical barriers and check points. Inmates within this security level present serious escape risks or pose serious threats to themselves, to other inmates, to staff, or the orderly running of the institution. Supervision of inmates is direct and constant.

**101.04**     <u>Massachusetts Correctional Institutions/Security</u>
<u>Designations</u>

1. Bay State Correctional Center .............. Level 4
2. Boston Pre-Release Center ................. Level 3/2
3. Bridgewater State Hospital ................ Level 4

-35-

4.    MCI Cedar Junction .......................... Level 6

5.    MCI Concord ................................. Level 4

6.    Contract Houses ............................. Level 1

7.    MCI Framingham .............................. Level 4

8.    Shattuck Hospital Correctional Unit ........ Level 4

9.    Massachusetts Treatment Center ............. Level 4

10.   Massachusetts Alcohol and Substance
      Abuse Center ............................... Level 4

11.   MCI Norfolk ................................ Level 4

12.   North Central Correctional Institution ..... Level 4
      NCCI Minimum Unit .......................... Level 3

13.   Old Colony Correctional Center ............. Level 5
      OCCC Minimum Unit .......................... Level 3

14.   Northeastern Correctional Center ........... Level 3/2

15.   MCI Plymouth ............................... Level 3

16.   Pondville Correctional Center .............. Level 3/2

17.   MCI Shirley ................................ Level 4
      MCI Shirley Minimum Units .................. Level 3

18.   South Middlesex Correctional Center ........ Level 3/2

19.   Souza-Baranowski Correctional Center ....... Level 6

-36-

## CERTIFICATE OF COMPLIANCE

I the undersigned, counsel for the Committee for Public Counsel Services as Amicus Curiae, hereby certify that this brief complies with the rules of court that pertain to the filing of briefs.

PETER M. ONEK
BBO #552993
COMMITTEE FOR PUBLIC COUNSEL SERVICES
Public Defender Division
44 Bromfield Street
Boston, Massachusetts 02108
(617) 482-6212

-37-

## RECORD APPENDIX

## Table of Contents

SUPREME JUDICIAL COURT DOCKET ENTRIES............A.A.1

LETTER FROM MACDOUGALL TO CHIEF JUSTICE
    MARSHALL....................................A.A.5

DEC. 2. 2005 1:52PM    SJC          -A.A. 1-                    NO. 1851   P. 1

12/02/05                COMMONWEALTH OF MASSACHUSETTS                    Page 1
                           SUPREME JUDICIAL COURT
                           FOR THE COMMONWEALTH

                                SJC-09509

                    MARK MacDOUGALL vs. COMMONWEALTH

```
   ENTRY DATE  06/02/05        CASE STATUS  Rule 2:21 Mem&Appx filed
  STATUS DATE  06/13/05             NATURE  Superintendence, c211, s3
 ROUTE TO SJC  DESJA            ROUTE DATE  05/24/05
AC/SJ DKT NO  SJ-2005-0181        DAR/FAR NO
   APPELLANT  D                 FAR APPLICANT                CV/CR CR
BRIEF STATUS  ared              BRIEF DUE  02/17/06          CLERK DL
  ARGUED DATE                      QUORUM
DECISION DATE                     CITATION       Mass.        RSCRPT
   LEAD CASE                      RELATION
  TRIAL JUDGE  Ireland R.L.      TRIAL CT  SJC for Suffolk County
TC ENTRY DATE  05/04/05        TC DOCKET NO  SJ-2005-0181    PUBLIC y
```

                          Additional Information

Add'l trial court info: 04-0056, Dortch-Okara, Norfolk Superior.

Commonwealth                       Brian A. Wilson, A.D.A.
Plaintiff/Appellee                 Office of the District Attorney/Norfol
Awaiting red brief                 45 Shawmut Road, 2nd Floor
next br. due 02/17/06              Canton MA 02021
1 Extensions, 190 Days             Phone: 781-830-4800 344
Active 05/04/05                     Fax: 781-830-4801
                                   634043 Active 05/04/05 Notify

Mark MacDougall                    Peter M. Onek, Esquire
Pro Se Defendant/Appellant         Committee for Public Counsel Services
Box 8000                           44 Bromfield Street, Suite 310-A
Shirley MA 01464                   Boston MA 02108-4909
Mem. & Appx. under Rule 2:21       Phone: 617-988-8391
Active 05/04/05 Notify             Fax: 617-988-8485
                                   552993 Withdrawn 10/28/05

S.J.C. for Suffolk County
(Lower Court: civil or general)
John Adams Courthouse, Room 1300
Pemberton Square
Boston MA 02108-1707
Phone: 617-557-1100 FAX: 617-523-1540
Active 05/04/05

/02/05                    COMMONWEALTH OF MASSACHUSETTS                    Page 2
                            SUPREME JUDICIAL COURT
                             FOR THE COMMONWEALTH

                                  SJC-09509

                       MARK MacDOUGALL vs. COMMONWEALTH

CPCS                                   Peter M. Onek, Esquire
Amicus                                 See above. (Notify)
44 Bromfield Street                    Active 11/14/05
Boston MA 02108
Awaiting green brief
Active 10/28/05

                      * * *  D O C K E T  * * *
--------------------------------------------------------------------------------
APER DATE      ENTRY
---- --------- -----------------------------------------------------------------

1.0 06/02/05 Entered. Notice to counsel.

2.0 06/02/05 MOTION to Waive Filing Fee, filed for Mark MacDougall, Pro se.
             *ALLOWED as to fee waiver only.

3.0 06/02/05 MOTION to file a Non-Conforming Memorandum of Law, filed for
             Mark MacDougall, Pro se. *ALLOWED. Ten copies may be filed.

4.0 06/13/05 SERVICE of Mem. & Appx. under Rule 2:21 for Defendant/Appellant
             Mark MacDougall, Pro se.

5.0 07/29/05 ORDER (By the Court): Mark MacDougall appeals from a judgment
             of a single justice of this court denying his petition pursuant
             to GLc211, s3. In 2002, he was indicted for certain felonies
             and held in the Norfolk County correctional facility in lieu of
             bail. While he was there, he allegedly assaulted a correctional
             officer. He was indicted for that offense and related offenses
             and ordered held without bail. He was subsequently transferred
             to the Plymouth County correctional facility and ultimately to
             the State prison at Cedar Junction, all while the various
             charges against him were pending. A superior Court judge denied
             his motion to transfer him to a jail or correctional
             institution while awaiting trial. This petition and appeal
             followed. MacDougal has filed a memorandum and appendix
             pursuant to SJC Rule 2:21, as amended, 434 Nass, 1301 (2001).
             Under this rule, MacDougall "must set forth the reasons why
             review of the trial court decision cannot adequately be
             obtained on appeal from any final adverse judgment in the trial
             court or by other available means." SJC Rule 2:21 (2).
             MacDougall argues that both transfers (to the Plymouth County
             correctional facility and to the State prison) violated GLc276,
             s52A; that the transfer to the State prison violated his
             Federal and State constitutional rights by subjecting him to
             punishment when he has not been convicted of any crime; and
             that he has no adequate remedy for these violations in the
             ordinary appellate process or otherwise. Without expressing an
             opinion on the merits of his statutory and constitutional
             claims, we are satisfied for purposes of Rule 2:21 that
             MacDougall should be permitted to proceed with his appeal in
             the ordinary course. If he is convicted, the conditions of his
             pretrial confinement will become moot, and any violation of his

/02/05                    COMMONWEALTH OF MASSACHUSETTS                     Page 3
                             SUPREME JUDICIAL COURT
                            FOR THE COMMONWEALTH

                                   SJC-09509

                        MARK MacDOUGALL vs. COMMONWEALTH

                          * * *   D O C K E T   * * *
------------------------------------------------------------------------------
APER DATE        ENTRY
---- --------    -----
                 rights in this regard cannot be remedied on appeal. Moreover,
                 we are aware of no other established means to obtain appellate
                 review of this particular type of order. In addition to their
                 arguments on the merits, the parties shall address in their
                 briefs whether adequate alternative remedies exist, including
                 but not necessarily limited to whether MacDougall is or should
                 be entitled to a direct appeal to the Appeals Court from the
                 denial of his interlocutory motion to transfer, or whether a
                 separate civil action commenced in the Superior Court
                 challenging the transfer would suffice. (Notice sent.)

6.0 08/03/05 NOTICE of address change, filed by Mark MacDougall, Pro Se..

7.0 08/03/05 MOTION for appointment of counsel, filed by Mark MacDougall,
             Pro Se.

8.0 08/16/05 MOTION to reconsider and strike the Court order of 7/29/05,
             filed for by Mark MacDougall, Pro Se.

9.0 10/14/05 NOTICE of Appearance filed by Peter M. Onek, Esquire. *NOTED.

10.0 10/17/05 MOTION to Withdraw Any and All of His Motions Pending on the
              Docket, filed for Mark MacDougall, Pro se.

11.0 10/17/05 SERVICE of appellant's brief w/appendix for Mark MacDougall,
              Pro se.

12.0 10/17/05 Petitioner's Second Notice of Address Change filed by Mark
              MacDougall.

13.0 10/19/05 Letter from Mark MacDougall regarding filing brief. *No action
              at this time.

14.0 10/27/05 Withdrawal of appearance of Peter M. Onek, Esquire for Mark
              MacDougall. *ALLOWED.

15.0 10/27/05 Letter from Atty. Onek regarding the withdrawal of appearance
              and plan to file amicus brief on behalf of Committee for Public
              Counsel Services in support of Mr. MacDougall's position.
              *Noted. Mr. Onek's appearance is withdrawn. Mr. MacDougall
              appears pro se.

16.0 10/31/05 Letter from Mark MacDougall: Appellant is proceeding pro se.

17.0 11/16/05 MOTION to extend to February 17, 2006, filing of brief of
              Commonwealth by Brian A. Wilson, A.D.A..

DEC. 2. 2005  1:52PM    SJC                -A.A. 4-                    NO. 1851   P. 4

12/02/05                    COMMONWEALTH OF MASSACHUSETTS                    Page 4
                              SUPREME JUDICIAL COURT
                              FOR THE COMMONWEALTH

                                   SJC-09509

                      MARK MacDOUGALL vs. COMMONWEALTH

                          * * *   D O C K E T   * * *
-------------------------------------------------------------------------
PAPER DATE        ENTRY
------ -------    --------------------------------------------------------
      11/18/05  ALLOWANCE of Paper #17 to 02/17/2006 for filing of brief of
               Plaintiff/Appellee Commonwealth. Notice to counsel.

18.0  12/02/05  Motion for reconsideration and in opposition to Commonwealth's
               motion for enlargement of time or in the alternative, reduce
               the enlargement by 30 days, filed for Mark MacDougall by Mark
               MacDougall, Pro Se.

-A.A. 5-

RECEIVED

MAY 2 0 2005

MAURA S. DOYLE
CLERK OF THE
SUPREME JUDICIAL COURT
FOR SUFFOLK COUNTY

Mark Mac Dougall
Mass. State Prison
Post Office Box 100
So. Walpole, MA. 02071

May 16, 2005

Hon. Chief Justice Margaret Marshall,
Mass. Supreme Judicial Court
One Beacon Street / 4th Floor
Boston, Massachusetts 02108

Re: MacDougall v. Commonwealth,
S.J. No. ~~2005-0181~~

Dear Chief Justice Marshall:
On April 27, 2005, I posted
for Filing my pro se Petition For
Extraordinary Relief pursuant to
G.L.ch. 211 § 3. My petition
challenges my pretrial detention
in the State Prison under Article
twelve of the Massachusetts
Declaration of Rights with a
paralell Federal Claim. And also the
Commonwealth's Failure to comply
with procedural mandates of G.L.ch.
276 § 52A requiring an order from

-A.A. 6-

Hon. Margaret Marshall, C.J.
May 16, 2005
Page two
_____

a justice of the Superior Court.
    To date, I have recieved No
acknowledgement from Ms. Doyle's
office regarding my filing(s). Not
only are my substantive rights
being violated, but just being in
Walpole puts my life in jeopardy
simply by the class of convicts
held in this institution. All I want
is my day in court your Honor, as
I have no other remedies, that
day is in your Honorable Court.
Therefore, could you please ask
Ms. Doyle to process this matter
without further delay.
    Thank you for your anticipated
time, attention and cooperation in
this endeavor for justice.

                        Very truly yours,
                        Mark McDougall
                        Mark MacDougall